JANUARY TERM, 1883, No. 289.                    MARCH 29, 1883.

## The Philadelphia National Bank *v.* Hilgert, Defendant, and The Philadelphia Warehouse Company, Garnishee.

1. Under the act of March 17, 1869, P. L., 8, the interest of the pledgor in pledged property may be attached in the hands of the pledgee.
2. A creditor, therefore, who has attached under this act and has then proceeded to obtain judgment and thereon has issued an execution attachment against the pledgee as garnishee is not to be preferred to an earlier attaching creditor of such interest under the same act.
3. The lien of the attachment under this act dates from the time the writ is issued and comes into the hands of the proper officer for service and not from the time of service on the garnishee.

Before MERCUR, C. J. ; GORDON, PAXSON, TRUNKEY, GREEN, and CLARK, JJ.

Error to Court of Common Pleas, No. 3, of *Philadelphia County.*

Attachments under the act of March 17, 1869, by The Philadelphia National Bank, by George C. Carson & Co., and by Charles C. Harrison against Charles M. Hilgert, trading as John Hilgert's Sons, defendant, and The Philadelphia Warehouse Company, garnishee.

The following facts appear from the sheriff's return to the writs and from the answers of the garnishee :

For some time prior to July 31, 1882, The Philadelphia Warehouse Company had advanced moneys from time to time to the defendant Hilgert upon the security of certain warehouse and wharfinger's receipts issued by E. A. Landell and by The Philadelphia Oystermen's Association for molasses and sugar stored with them and belong-

ing to said Hilgert, and duly assigned by him to the Warehouse Company. Hilgert also gave with these receipts a contract in which he agreed that the Warehouse Company should have the right to sell the property advanced upon and repay themselves, or to sell the receipts, at their option. At the time the above attachments were served the Warehouse Company held twenty-three of these receipts upon which they had advanced $184,000. On July 31, 1882, the goods covered by these receipts, while still in the custody of the wharfingers and warehousemen, were levied upon by the sheriff under four writs of *fi. fa.* issued upon judgments entered that day in favor of William H. Remsen *et al.* These judgments were fully paid and satisfied from the proceeds of levies and sales, thereunder of other property of Hilgert.

The following writs of attachment, under the act of 1869, came into the hands of the sheriff for service, on August 1, 1882, in the following order:

1. That of George C. Carson & Co., at 2.15, P.M.
2. That of Charles C. Harrison, at 3.20, P.M.
3. That of the Philadelphia National Bank, at 3.25, P.M.

The writs were served upon the defendant by leaving a copy at his dwelling-house with an adult member of the family; upon the Philadelphia Oystermen's Association, E. A. Landell, and the Philadelphia Warehouse Company, all named in the writ as garnishees, as follows: Upon the Philadelphia Oystermen's Association, the Harrison writ was served August 2, 1882, at 11.30, A.M.; the other writs, August 5, 1882, at 5.20, P.M.; upon E. A. Landell all the writs were served together on August 7, 1882, at 3.30, P.M.; upon the Philadelphia Warehouse Company, the Harrison writ, August 2, 1882, at 12.40, P.M.; that of the bank, August 2, 1882, at 3.22, P.M.; and the Carson writ, August 7, 1882, at 10.05, A.M.

The sheriff returned these writs "attached as within commanded, August 1, 1882, subject to prior levies made under four certain writs of *fieri facias* . . . certain goods and chattels, as per schedule hereto annexed, etc."

The Warehouse Company gave the sheriff notice of its claim of property in the goods levied upon; the sheriff's rules for interpleaders were made absolute, the *narrs* and bonds filed as required, and security being entered, the claimant obtained possession of the goods. In view of their perishable nature, the plaintiffs in all the attachments united in a written request to the Warehouse Company that the merchandise should be sold, "the net proceeds

thereof  to be subject to all rights therein, as if said sale had not been made."

The sale was made as requested, and after repaying their advances and interest, the Warehouse Company made a special deposit of the balance, which, with interest, amounted at the time judgment was given in the court below to $37,140 55, to await the result of the contest between the attaching creditors.   Of these, Harrison and the bank had prosecuted their claims to judgment, and after the above balance was ascertained, on October 26, 1882, obtained writs of attachment *sur* judgment, which were served the same day upon the Warehouse Company as garnishee.

The sum claimed by Carson & Co., was $12,064 69 ; by Harrison, $12,965 80 ; and by the bank, $30,676 67.

The cases were heard together in the court below by agreement, and judgment entered first in favor of Carson & Co., and second in favor of Harrison, for the full amount claimed by them, and the balance, $12,110 06, was awarded to the bank, on account of their judgment; LUDLOW, P. J., delivering the opinion of the Court, as follows:

"The ingenious and able arguments of the counsel for the several execution attachment creditors have failed to convince us of the legal correctness of their positions, and we see no reason why they should be preferred to the several attaching creditors under the act of March 17, 1869.

It is true that at common law the sheriff could not seize the property in the actual manual possession of the garnishees and claimants in the interpleader, because as a principle "goods pawned or gaged for a debt cannot be taken into execution against the pawnor or lessor:" Watson on Sheriff, 182 ; and hence it followed, as another general principle, that a pledgee might maintain trespass against the sheriff or his vendee under the execution.

We are also inclined to believe that the same principle must apply to the act of 1869, and that so long as the Warehouse Company had the possession, or right of possession, of the goods, the sheriff could not seize them, for the act expressly declares, when the goods are not capable of manual seizure, 'the same shall be bound by such attachment in the hands or possession of such party from whom it is due or owing, or whose duty it is to account for the same.'

To this point we agree with the counsel for the execu-

tion attachment creditors; further than this we cannot go, for the following reasons:

*First.* The act, as to personal property, (for it has been decided that it does not apply to real estate: Bank *v.* Draper, 8 Norris, 446,) binds something beyond that which is in exclusive possession. The terms of the act are very sweeping; it declares it shall be served 'by attaching so much of the money, stock, right in action, evidence of debt, or other property of said party defendant as will be sufficient to pay the debt demanded.' And again, section 3, 'the same shall be bound by such attachment in the hands or possession of such party from whom it is due or owing for the same.'

When the object of the act of 1869 is considered, it must be evident that it was the intention of the Legislature to reach every description of personal property belonging to an absconding or fraudulent debtor. The vigilant creditor was to be rewarded, not only for his own sake, but as a matter of public policy. To say that a creditor, who has attached under the act of 1869, and then proceeded to obtain a judgment, upon which he issues an execution attachment, shall be preferred to the creditor who first attaches under the act of 1869, is, we think, to pervert the true intent and meaning of the act.

To render the construction of the act unambiguous, the words 'other property' are introduced. It is true 'pledged or pawned property' is not specified as in the sections 23 and 35 of the act of June 13, 1836, but until it can be established that 'other property' does not include all property which may in any event belong to the defendant, we shall adhere to a construction which will defeat any intent or attempt of a fraudulent debtor to escape the legal effect of the act of 1869, and that by simply pawning or pledging his personal property.

*Second.* Upon the question of priority of lien, we are also of the opinion that the lien of these attachments dates from the time the writs were issued, and came into the hands of the proper officer for service, and not from the time of service on the garnishee.

It is admitted that in the absence of a statute, neither the issue of an attachment, nor its lodgment in the hands of an officer, confer any rights upon the plaintiff in defendant's property; it is only when the writ is served: Drake, 263. In this instance, and under the act of 1869, the statute establishes the law, and seems to us to be in conformity with the principle which dictated the act. The law was intended to destroy fraud, and to defeat

every effort of a fraudulent debtor to escape the active effort of an honest creditor. If a vigilant creditor may not only attach, but must serve the attachment before he acquires a lien, then, indeed, the object of the law itself will be defeated.

To avoid just such a question as has been argued in these cases, the law declares: 'In case two or more attachments are issued against the same party defendant, the one first in the hands of the proper officer for service shall have the prior lien, and so on as to other writs issued in pursuance of this act, in the order of time in which they are issued to said officer.' The practice cannot therefore be the same as under other writs of attachment.

It was argued with great force that a hardship would, by our construction, be inflicted upon an ignorant garnishee. Our answer is, that the law, for wise purposes, has declared what the rule shall be, and also that all parties dealing with one who proves himself to be a dishonest man, must, in the very nature of the case, take the risks incident to an unfortunate position. If fraudulent debtors find no method of escape, it is fair to presume that few will attempt that which must ultimately result in failure, and to adopt a construction which simplifies the machinery of the law is the best method, first, to prevent, and secondly, to crush fraud."

The Philadelphia National Bank thereupon took this writ, assigning for errors (1 and 2) the action of the Court in entering judgment for the Philadelphia National Bank in the sum of $12,110 06 and in not entering judgment for the entire balance due the bank by Hilgert; (3 and 4) in entering judgment for Carson & Co. in the sum of $12,064 69, and in entering judgment for them in any sum whatsoever.

*William Henry Rawle* for the plaintiff in error.

The sheriff could not seize the goods under a *fi. fa.* nor could he attach them under the act of 1869. "To this point," said the Court below, "we agree with the counsel for the execution creditors." Nor did the attachment bind, or pretend to bind, anything but the goods themselves. It is urged, and the Court below so decided, that although the sheriff could not attach the goods themselves, yet, as Hilgert might, in a possible event, have a claim to a margin after the Warehouse Company was paid, this claim was the subject of attachment and was attached. The record shows the contrary; what was attached was the sugar itself; "attached as within com-

[Phila. Nat. B'k *v.* Hilgert, Def't, and The Phila. Wareho'e Co., Gar.]

manded, certain goods and chattels, as per schedule hereto annexed, as the property of Charles M. Hilgert." No equity of redemption or right of action that Hilgert might have was attached ; and until the amount due the Warehouse Company was ascertained, the balance was not subject to attachment of any kind.

Conceding, however, that the attachments under the act of 1869 did bind something in the hands of the Warehouse Company, then priority of lien will rank as to the time of service upon the garnishees, and not as to the mere time of issuing the writ.    It is submitted that, by necessary implication, section 5 of the act of 1869 should be read (the words in italics being interpolated) "In case two or more attachments are issued against the same party defendant, the one first in the hands of the proper officers for service *and served* shall have the prior lien, and so on as to other writs issued in pursuance to this act, in the order of time in which they are issued to said officer *and served.*"    The plaintiff is bound, in cases of foreign attachment, domestic attachment, and attachment *sur* judgment, to designate what the sheriff is to do—where he is to go, what he is to attach.    Why should the law be otherwise (except for the *ita scripta est*) under the act of 1869 ?    Suppose two attachments come into the hands of the sheriff, one on Monday from a plaintiff who knows nothing about any goods of the defendants anywhere, the other on Saturday by a plaintiff whose vigilance has discovered goods and tells the sheriff where to go.    The garnishee is served with the latter writ, reserves enough to pay the plaintiff's debt, interest and costs, and lawfully parts with the rest.    The first plaintiff hears of this, directs the sheriff to attach, and the garnishee, who has parted with all except what will satisfy the second writ, is told that the secret lien of the first writ bound him from the time it came into the sheriff's hands, although not served.    The same interpretation of the act would divest the lien of an assignee for the benefit of creditors under similar circumstances    Carson's writ, although first issued, on August 1, was not served upon the garnishees until August 7.    It is submitted that the writs of the bank and Harrison, being first served, should have priority.

Scott *v.* Scholey, 8 East, 484 ;    Pierce *v.* Sweet, 9. Casey, 151 ;   Mathias Sellers, 5 Norris, 490 ;   Rothermel *v.* Marr, 2 Out., 285;   Long's Appeal, 11 Harris, 297 ;   Baldwin's Appeal, 5 Nor., 483.

[Philadelphia and Reading Railroad Company v. Noar.]

*J. E. Gowen* and *E. H. Hanson* for Carson & Co.

The alleged transgression of the sheriff, in seizing the goods for which receipts had been assigned to the Warehouse Company, was not a transgression against the attaching creditors, under whose writs the manual seizure had been made nor against the subsequent attachment-in-execution creditors, but against the Warehouse Company ; and long before the judgment was rendered in the court below, the interest of the Warehouse Company in the property of the proceeds thereof had ceased and the money distributed by the judgment represented only the proceeds of Hilgert's interest in the property.

Whether the Legislature acted wisely or not in providing that priority should be determined by the consecutive order in which the writs were delivered to the sheriff, is a matter of no importance.     Such provision has been made in terms too clear to be misunderstood.

Pennsylvania Railroad Company *v.* Pennock, 1 P. F. Smith, 244 ; Baugh *v.* Kirkpatrick, 4 P. F. Smith, 84 ; Carty *v.* Fenstemaker, 14 Ohio State Rep., 457 ; Hale's Appeal, 8 Wr., 439.

APRIL 16, 1883.—PER CURIAM : The opinion of the learned judge contains a clear and satisfactory statement of the law in its application to these cases, and on that opinion the judgments are affirmed.